THOMAS POWELL, Appellant, *v.* THE NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, Respondent.

*Court of Appeals, March 20, 1888.*

Affirming same case, 38 Hun, 640, Mem.

1. *Negligence. Contributory.*—The plaintiff, in an action for injuries alleged to have been caused by defendant's negligence, is bound to establish his own freedom from negligence contributing to the accident producing the injury of which he complains; and if he fails to do so, he is properly nonsuited.

2. *Same:*—Where, in such an action, the plaintiff's testimony showed that he approached the railroad crossing, driving at the rate of about ten miles an hour, that a strong wind was blowing and it was snowing very fast, and that he was acquainted with the crossing and knew that trains were frequently passing, the plaintiff was chargeable with contributory negligence.

Appeal from a judgment of the general term of the supreme court, affirming a judgment entered upon a nonsuit granted at the circuit.

*W. T. Dunmore,* for appellant.

*J. Thomas Spriggs,* for respondent.

PER CURIAM.—The plaintiff was bound to establish his own freedom from negligence contributing to the accident causing the injury of which he complains. In this we

think he failed, and therefore he was properly nonsuited.

According to his own evidence, which was more favorable to him than the evidence of the other witnesses, he approached and crossed the railroad tracks at the rate of about ten miles per hour, while a strong wind was blowing from the west, and it was snowing very fast, and his opportunity to see and hear was thus considerably interfered with. He knew that he was approaching a place of danger, and that trains were frequently passing at that place. He should have driven slowly and carefully, watching for the approach of trains, vigilantly using his eyes and ears to protect himself from danger. If he had observed these precautions, under the circumstances dictated by ordinary prudence, we think he would have escaped harm.

The judgment should, therefore, be affirmed.

All concur, except DANFORTH, J., who reads for reversal, and ANDREWS, J., concurs.

DANFORTH, J. (dissenting).—I cannot concur in the decision about to be rendered in this case. The question is, was there any evidence which should have been submitted to the jury? Labar *v.* Koplin, 4 N. Y. 547 ; Howell *v.* Gould, 3 Keyes, 422 ; Stubley Case, L. R. 1 Ex. 15 ; Ryder *v.* Wombwell, L. R. 4 Ex. 32 ; Painton *v.* Northern Central Railroad Company, 83 N. Y. 7. That the plaintiff was struck and seriously injured by the defendant's locomotive, at a crossing of the Ilion highway, is not denied ; that the locomotive approached from the west, at a speed of from forty to fifty miles an hour, is not denied ; that the defendant, on that occasion, in no particular obeyed the statute as to giving signals of its approach, is denied. There was, then, clear and criminal negligence on the part of the defendant's servants. Laws of 1850, chap. 140, § 39 ; Penal Code, § 421. Negligence on the defendant's part was assumed by the trial judge and by the general term. Both

courts, however, were of opinion that the plaintiff was himself guilty of negligence contributing to the injury, and held the defendant harmless.   Was there any evidence fit to be considered, upon which fair, dispassionate men, having no respect of persons, indifferent between the parties, could consistently, with reason and justice, arrive at a different conclusion?   If there be such evidence, then the judgment in this case violates the constitution, which secures to the citizen the right of trial by jury, and the law which declares that trials of fact in every court of common law jurisdiction shall be held by jurors.   Bagley *v.* Bowe, 105 N. Y. 179; 6 N. Y. State Rep. 842.

The claim was that the injury occurred "without any fault or negligence of the plaintiff."   It was undoubtedly for the judge to see if any matter in evidence sustained it. If it did, the plaintiff's request to have it answered by the jury should have been granted.   His right to take their opinion upon it was as comprehensive as the issue, and the trial court erred in denying his application.   What was proven?

At the *locus in quo* the railroad of four tracks, running east and west, crossed the highway nearly at right angles. One hundred and forty feet north of the fourth, or north track was a narrow road, called the turnpike, to Frankfort. It was intersected by the Ilion road.   The plaintiff was a teamster and he and two others, Williams and Hughes, were at the time engaged in drawing stone to a place above Ilion station, he with a pair of horses and a bob sleigh and they with another team.   They were all returning unloaded. They came from the east along the Frankfort turnpike, and passing the station turned south along the Ilion road, and there faced the railroad.   At this point the view toward the west and along the tracks was obstructed by a high board fence, a two-story house, a coal tressel and pockets, and so far as appears the road could not be seen by a traveler except directly in front until he came to a point twenty-two feet north of the fourth track.

The witness, a surveyor, made no measurement, and did not try to see, " but thinks," you could from that point see a quarter of a mile nearly, in a clear day, and "from the centre of the fourth track nearly half a mile in a clear day." The witnesses agree that the day in question was not clear, but very stormy; it was snowing and blowing hard from the west," and as plaintiff's course was at first west, and then southwesterly, it beat directly against his face. He says: " As I looked toward the west, the snow blew in my face so that it almost blinded me." " As I approached the tracks I looked both ways." " It was snowing so as to obstruct the view." As to this there is not only the plaintiff's statement, but from others a concurrence of testimony. The plaintiff says : " Before driving on to the tracks, I listened, and looked both ways." " I heard or saw nothing ; no bell was rung or whistle blown." He drove on the tracks, neither seeing nor hearing anything ; crossed the fourth, third and second, and had reached the south or first track, and was partly over that, when the rear runner of his sleigh was struck by the locomotive. This upon his direct examination. Asked by defendant's counsel, he said : " There were four teams, two behind, and one Mr. Williams ahead of me. The snow was coming from the west, I looked while I was crossing on the tracks ; I can't say whether I was on the first, second, third or fourth track, when I looked. I kept looking all the time." " I was coming over on a slow trot, at the rate of about ten miles an hour; when I was on the track, I was coming at the same gate ; I did not whip up my horses when I was crossing ; did not have a whip in my hand." On further examination, he says : " I looked up towards the west as I got to the track ; I guess I was about ten feet from the north track, when I looked both east and west ; I then drove on to the track ; I kept looking both ways after I drove on to defendant's tracks ; I could not see to exceed ten rods, on account of the storm ; it was snowing very hard ; my eyesight is good ; my hearing is good."

Again, cross-examined; he says : "I am forty-five years of age; I looked for the train when I got in sight of the track ; I was then about ten rods from the track ; I kept listening and looking as I drove along : when I got to the track I looked east and west for the train ; I kept looking for the train ; I looked for it when I drove on to defendant's north track ; I could not see the train then ; Mr. Dunmore asked me where I was when I looked ; I told him I kept looking all the time ; I can't tell why I told Dunmore I was ten feet from the track when I looked, and then told you I was ten rods from the track when I looked."

Upon this testimony, how did the case stand? The defendant was running its train at the rate of seventy-three feet in a second toward and across the highway, and in the midst of a storm of wind and snow, without bell or whistle, the snow covering and in effect padding the rails, prevented any audible vibration from the moving train, and screened the train itself from observation ; the plaintiff could not see; there was nothing to hear. In judging his conduct all these circumstances are to be considered. If he saw no train, the omission of signals was an assurance by the defendant that none was approaching within a quarter of a mile of the crossing. His eyes were filled, and their vision obscured, by snow, intervening between him and the coming train. What did the plaintiff do that the most prudent person would have omitted ? What did he omit which the most prudent person would have done ? He had a lively consciousness of the existence of the tracks, the danger they implied, and his duty to avoid that danger. As he approached the track, he looked and listened ; he looked both ways ; he saw nothing, nor did he hear anything. While actually crossing the tracks he did the same thing ; he looked and listened. If the plaintiff tells the truth, he was vigilant.

It is said by the court below that when the plaintiff was at the north track, the train was at a point 293 feet from the crossing, in plain sight, " except for the storm ; " and again

it is said, " making all possible allowances for errors in the estimation of the speed of the train and team, the train must have been in plain sight and hearing of the plaintiff when he was at the north track, unless his vision and hearing were obstructed by the storm then prevailing."

I find no foundation for an opinion that at the time mentioned the train was within " the hearing of the plaintiff," but quite otherwise. No signal was given. But even in the view presented by the trial judge, the existence of the storm and its atmospheric effect upon radiation and refraction, its influence in impeding sight becomes very important.

Who is to say that the effect of the storm was not that suggested by the court, to shut the train out of sight and hearing, if otherwise it might have been heard? What formula of law will settle that question? Both the wind and the train were from the west. A storm, not of wind only, but of snow prevailed, " a blinding storm of snow," the plaintiff and others say, obscuring his vision, and certainly filling the air between him and the locomotive. No one disputes the fact or the consequence. There is no contradictory evidence as to the force of the wind or the density of the snow. The expressions, of the plaintiff, above set out, are corroborated by every witness examined on the subject. Williams says " it was snowing and blowing so as to intercept the view." Newell says it was a very stormy day; it snowed and blowed very hard; could see but a short distance on account of the storm. Cronk says, " it was a very stormy day, and snowing hard: a person could not see a great distance on account of the storm." He was with his team behind the plaintiff, looking for the train and did not see it until it had passed the crossing and was opposite the freight station. There is not a word of evidence to change or vary these expressions as to the storm and its operation. Indeed it is all assumed to be true. What is the answer?

The only argument now presented to sustain the decision of the court below seems to be found upon the rate of speed

at which the plaintiff drove upon the track, and the con-
clusion is reached as an absolute matter of law, that the
plaintiff failed to exercise that care required of the traveler
when the highway over which he seeks to pass is intersected
by a railway. Men may differ as to whether a traveler at
such a crossing should hurry over a track or go slow over
it, or even take time to pause. It has never been defined
as matter of law, but bearing upon it are the observations
of FOLGER, Ch. J., in *Aldoph's Case* (76 N. Y. 535), declar-
ing with some precision the duty of the traveler who, he
says, being at the crossing, must take care that he does not
get in the way of a coming train, first having looked and
listened. " He may not stop on it, if a stoppage may be pos-
sibly avoided. He may not waste time in crossing. He
must be as sure as he may be from sight and hearing that
it is prudent to cross at that moment, and then he must
hasten over." It would seem to follow that no particular
rate of speed can be prescribed, or the driver be limited to
any. He is in each case simply bound to use proper care
and prudence to avoid injuring others or causing injury to
himself from approaching vehicles on the street, or approach-
ing trains toward and over the street crossing. One must
get over and if the track is clear, it would seem that the
sooner this was done the more prudent the driver ; but that,
no doubt, depends upon all of the circumstances of the case.
The evidence shows that at this point trains passed " every
fifteen minutes." Defendant's counsel says " the plaintiff
knew that fact." We have the other fact that the bell did
not ring, nor the whistle sound. The object of the legisla-
ture in requiring one or the other was that the approach of
the engine should be announced and the traveler have notice.

If either had sounded, the plaintiff might have stopped
until the train passed. It did not sound; no train was in
sight. Under such circumstances, with a knowledge of the
frequent trains, and the assurance that none was at the mo-
ment coming, the natural impulse might be to go forward

and improve the interval of safety.   It is, however, contended that " the speed at which the plaintiff drove upon and over the track was clear negligence," negligence in law.   I recall the evidence, therefore, upon that point.   In giving an account of the matter the plaintiff simply said :   " I was driving at a slow trot."   When cross-examined he is reported to have said : " I was coming over at a slow trot, at the rate of about ten miles an hour."   The question is not given and how much of the answer was an echo to the question and at its suggestion, we do not know.   But how fast was he going ?   On both examinations he says, " on a slow trot," and taking it as we must from the record without explanation, he does on the cross-examination say also, " at the rate of about ten miles an hour."   This is upon its face inexact and merely an approximate statement, and when coupled with his statement also drawn out on cross-examination, that " he· did not whip up his horses ; did not have a whip in his hand," we can see that they were probably going at a natural, certainly not a forced gait, and in connection with the statement they were going " slow " the jury might infer that a team of horses used for drawing stone, and then returning after that work, were not likely to be moving at the pace named.   To say that he was going " about ten miles an hour," was to utter a guess or surmise, an estimate merely, and even then qualified by a word which itself signifies merely an indeterminate opinion.   It was therefore a question : 1st, as to how fast he was, in fact, going ; and, 2d, whether the speed so ascertained was or was not prudent, under the circumstances, as those circumstances either were or ought to have been known to him.   To say that the speed was excessive there must be proof of what the speed was, and also that the particular rate so proven was excessive, and both of these matters were necessarily for the jury.

In Steves Case (18 N. Y. 422), that the approaching traveler went slow, did not increase his speed, was a species of conduct dwelt upon as indicating negligence.   In the

Stackus Case (79 N. Y. 464), the team was going at the rate "of about six miles an hour." A nonsuit granted by the trial court was set aside. But however determined, the answer bore only on the question whether the plaintiff ex-ercised reasonable care and prudence to avoid a collision, and we should not screen the defendant by taking the loose expression of the plaintiff, and holding him as to an exact statement of an extreme rate of travel. Nor should his haste, if haste there were, to avoid a danger which although not seen, was at some time to be expected, be dignified into a legal premise, and distorted into unmitigated and culpa-ble carelessness. It might or might not permit such an inference. It does not demonstrate it.

It might be found that there was no bell or whistle ; no train seen or heard by him ; but trains running frequently ; nothing, therefore, for him to do but " hasten " to get over as soon as possible. But what is reasonable care on the part of a traveler approaching a railroad track? It is held that it cannot be said as matter of law that one traveling in a covered carriage must let the top down that a better view may be obtained. Stackus *v.* Same (*supra*). Nor need he leave the carriage and go to the crossing (Davis' Case, 47 N. Y. 402; Dolan *v.* Delaware and Hudson Canal Company, 71 id. 285), nor stop his wagon before passing upon the track. Kellogg *v.* Same, 79 N. Y. 73. These decisions go upon the ground that such circumstances would indicate a degree of care not common even to very prudent persons (Davis' Case, *supra*), and as we have repeatedly said, such a traveler is not bound to the greatest diligence which he could have exercised in that way. Kellogg's Case (*supra*). But what precautions he should observe applicable to all situations the court has not said; it is settled, however, that the traveler exercises the ordinary care required of him when he makes a " vigilant use of the eyes in looking, and of the ears in listening," to ascertain whether there is a train approaching, and finding none, he

2

must then "hasten over." Adolph's Case (*supra*). That the plaintiff did so the testimony on his part completely establishes. It certainly cannot be said that the condition of the weather was immaterial, nor that the existence of the storm was not a fact to be considered in estimating the plaintiff's conduct, and might fairly guide the verdict.

A similar circumstance was present and giving controlling influence in Hackford *v.* N. Y. C. and H. R. R. R. Co. (43 How. Pr. Rep. 222), where a nonsuit was set aside and, after a new trial, a verdict for the plaintiff sustained at general term and in this court (53 N. Y. 654).

In Hart *v.* Erie Railway Co. (3 Alb. L. J. 312), decided by this court in 1870, importance was attached to the fact that at the time in question a strong wind prevailed, which raised a cloud of dust, and so affected the plaintiff's sight. So in substance in Sherry's Case (104 N. Y. 652; 5 N. Y. State Rep. 574).

It is at least plain there is not conclusive evidence that the plaintiff did not use his eyes by looking as far as he could up and down the track, or that he failed to use his ears, because he did not detect the approach of a train when no signals were given. On the other hand it is apparent as the case now stands, that the operations of nature made his sight ineffectual, and the criminal negligence of the defendant rendered his sense of hearing of no avail, and deprived him of the protection which those signals were intended to afford. People *v.* N. Y. C. R. R. Co., 13 N. Y. 81.

It was the duty of the plaintiff to use his eyes, for the same reason that it is the duty of a railway to adequately light its engines at night that its servants may be enabled to see obstructions at as great a distance as possible; but when the headlight of a locomotive became so obscured by a driving mist that an obstruction was not seen and a collision occurred, the defendant was held not liable, because not responsible for the operation of natural causes upon its appliances. L. and N. R. R. *v.* Melton, 2 Lea (Tenn. Rep.),

262. The eye is the light of the body, and the same rule must shield the plaintiff if his failure to see can be attributed to the snow filling his eyes and obscuring his sight.

These circumstances, with the known frequency of trains, bear very directly upon the question whether the speed actually attained by the plaintiff in crossing a dangerous locality exceeds that which a man of ordinary care and prudence would have indulged in on the occasion in question. It involves more or less of conjecture. It is a question concerning which men may differ, and it is difficult for me to conceive of a case more appropriate for the consideration of the jury than the one disclosed by the record before us. Bernhard *v.* The R. and S. R. R. Co., 1 Abb. Ct. App. 131; Weber's Case, 58 N. Y. 451; Hart *v.* Bridge Co., 80 id. 622; Stackus *v.* N. Y. C. R. R. Co. (*supra*); Massoth's Case, 64 id. 529; Greany's Case, 101 id. 419.

I think the trial judge erred in taking the case from them, and that the plaintiff is therefore entitled to a new trial.

ANDREWS, J., concurs.